MARGUERITE I. SCHOTT *vs.*
BOSTON SAFE DEPOSIT AND TRUST COMPANY,
trustee and administrator, & others.

Middlesex.     January 8, 1969. — April 7, 1969.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, SPIEGEL, & REARDON, JJ.

*Contract,* What constitutes, Antenuptial agreement.

There was no error in the dismissal of a petition by the widow of the settlor of a trust, amendable only by him, for specific performance of an alleged "promise" made by him in conversations with her prior to their marriage to amend the trust so as to give her one third thereof where there was no evidence that the settlor intended his statements during such conversations to be anything other than announcements of his intention to amend the trust and he died without having done so.

PETITION IN EQUITY filed in the Probate Court for the county of Middlesex on May 25, 1966.

The case was heard by *McMenimen,* J.

*Jules E. Angoff* (*Paul Sullivan* with him) for the petitioner.
*William T. Conlan* for Anne Coe & another.
*Louis F. Eaton, Jr.*, for Boston Safe Deposit and Trust Company, trustee, & another.
*Vincent V. R. Booth*, for Boston Safe Deposit and Trust Company, administrator.

SPIEGEL, J. This petition brought in the Probate Court seeks specific performance against the respondent Boston Safe Deposit and Trust Company (hereinafter referred to as the bank), as trustee,[1] of an alleged oral contract made between the petitioner and her late husband, Edward Henry Schott, prior to their marriage. The Boston Safe Deposit and Trust Company was also named as a respondent as the administrator of the estate of Edward Henry Schott. Demurrers were filed which were overruled. The bank, as administrator, also filed a counterclaim to recover $52,093.[2] The petitioner appeals from a decree dismissing her petition, and the various respondents appeal from the decrees overruling their demurrers. The bank, as administrator, appeals from that portion of the decree which dismissed its counterclaim. The evidence is reported.

Because our decision is based on the actual facts there is no need for a discussion of the respondents' demurrers. *Walcott* v. *Cambridge*, 351 Mass. 32, 33.

We summarize the relevant evidence. The petitioner knew Edward Henry Schott, a physician, and his first wife for ten or fifteen years. She occasionally traveled with the Schotts, had dinner with them regularly and attended the theatre with Mrs. Schott. Mrs. Schott died on October 30, 1963. About one year later the petitioner and Schott resumed their friendship. They had dinner together and played cards together. When Schott fractured his hip in January, 1965, and was hospitalized, the petitioner visited him "almost every night." They continued seeing each

---

[1] Also named as respondents were Edward H. Schott, Jr., Anne Coe and Elizabeth A. Antaya, the children of Edward H. Schott by a prior marriage.

[2] This sum is for payments made to the petitioner by her late husband and the balances in certain joint bank accounts transferred to her.

other following his discharge from the hospital. Sometime during the spring of 1965 Schott suggested that they "were both lonely and . . . should get together." The petitioner was then fifty-eight years of age and Schott seventy-three. She was a schoolteacher and was completing her twenty-ninth year of teaching. She told Schott that she "did not want to give up teaching." In May of that year Schott again suggested marriage, but the petitioner ignored the suggestion. In August, the petitioner was driving Schott to visit some of his patients and "on the way . . . [they] stopped" at a jewelry store so that presumably he could have his watch repaired. While they were in the store, however, he had the jeweler bring out a tray of diamond rings. She tried on several and when she found a ring that fitted, she "put it on and wore it." The next day Schott announced to the petitioner that they would get married on November 6, 1965, to which she agreed.

On September 2, 1965, the petitioner prepared a letter of resignation to the superintendent of schools. Before she mailed the letter she informed Schott of its contents. He inquired as to why she had not retired. She told him that it was "pretty hard to give up teaching after 29 years," that her pension would be much lower and that she was "hesitant" to lose the fringe benefits. Schott then said, "But you won't need that rate. You won't need to work anymore. I wouldn't ask you to marry me and give up all that, and not take care of you. You know that I have a trust. I do not know, six or seven hundred thousand dollars. . . . In January, when I get my tax papers together, we will go into the . . . [bank], and I will have it fixed so that you will get one-third of the trust." The petitioner responded that, should anything happen to him, she wanted the right to return to teaching.[3] She mailed the letter of resignation that day.

---

[3] "Resignation" did not preclude the opportunity to resume teaching in the future. At that time, under the provisions of G. L. c. 32, § 91, amended through St. 1964, c. 37, retirement prevented a teacher from being paid, except for limited service as a substitute teacher, for "any service rendered to the commonwealth or any county, city, town or district."

During the following weeks Schott raised the question of her retirement several times. When the petitioner reiterated her reasons for not wanting to retire, Schott told her she was "worrying foolishly." Following one of these conversations the petitioner talked to the executive secretary of the Massachusetts teachers' retirement board. She was informed that, as far as her pension was concerned, it would not make "very much difference" if she retired rather than resigned. She was advised to retire. A few days later the petitioner discussed the matter again with Schott. He told her, "Stop worrying about the pension; you won't need it. I will take care of you. I will give you one-third of that trust." She told him that they "would go ahead, and . . . [she] would retire." She sent a letter to the superintendent announcing her intention to retire. Subsequently, she filed an application for "retirement" which became effective as of October 29, 1965.

The petitioner and Schott were married on November 6, 1965. Sometime during the following January Schott became ill. He was hospitalized from January 16 to February 12. About one week after he was discharged from the hospital Schott asked the petitioner to communicate with the bank and arrange for an attorney to call upon him so that he could change his will and the trust. On February 24, 1966, two representatives of the bank visited the petitioner and Schott. Schott told them that he wanted the petitioner "to have one-third of the trust and . . . any other property that he had." An appointment was made to accomplish this on a Saturday, about two weeks later. The appointment was subsequently set for March 8. During the early morning hours of March 8, Schott became ill. He died the following day without having amended the trust. The trust indenture provided that "[a]t any time or from time to time during . . . [his lifetime], this trust may be modified, amended, altered, or revoked in whole or in part by means of a written instrument signed and acknowledged by . . . [Schott] and delivered to the Trustee."

The petitioner contends that the conversations she had

with Schott prior to their marriage constitute a "legally binding" contract. She asserts that there was "overwhelming evidence" of his "promise" to amend the trust. She argues that, relying upon his "promise," she retired from teaching "to her great financial prejudice."

There was no evidence that Schott intended his statements during these conversations with the petitioner to be anything other than announcements of his intention to amend the trust. There was no evidence that, had the petitioner not retired, Schott would not have amended the trust. Nor was there any evidence that, had Schott not announced that he would amend the trust, the petitioner would not have retired. Her decision to retire was reached only a few days after she was advised to do so by the executive secretary of the Massachusetts teachers' retirement board. The trial judge was not required to believe that Schott's amending the trust was conditioned on her retirement or that her retirement was conditioned on his amending the trust.

The petitioner directs our attention to a decision of the Supreme Court of Missouri, *Thompson* v. *St. Louis Union Trust Co.* 253 S. W. 2d 116. She asserts that the facts of that case are "on all fours" with the facts of the instant case. In that case the deceased husband had promised his future wife that, if she would give up her job, he would go to the bank and change his papers so that she would receive all of his property. In that case, however, the plaintiff's testimony regarding the conversations and language relied on to prove the contract was corroborated by the testimony of five other persons. In holding that there was sufficient proof of an oral contract, the Supreme Court of Missouri listed eight criteria which must be met in order to recover on such a contract.[4] Even if we chose to adopt

---

[4] The Court quoted with approval from the case of *Walker* v. *Bohannan*, 243 Mo. 119, the "circumstances under which a court of equity will enforce an oral contract made with a deceased person." They are as follows:

" '(1) The alleged oral contract must be clear, explicit, and definite; (2) it must be proven as pleaded; (3) such contract cannot be established by conversations either too ancient . . . or too loose or casual . . .; (4) the alleged oral contract must itself be fair, and not unconscionable; (5) the proof

the Missouri rule we do not think that the petitioner in the instant case fulfilled all of those criteria.

Admittedly, Schott wanted the petitioner to receive one third of the trust. He clearly intended to amend the trust so that she would. There is no question that, had death not intervened, he would have done so. However, death did intervene and he did not amend the trust. We cannot amend it for him. There was no error in dismissing the petition.

We see no need for a detailed statement of the facts with regard to the bank's counterclaim. Our examination of the transcript reveals that there was ample evidence to substantiate the decree dismissing the counterclaim. See *Kittredge* v. *Manning*, 317 Mass. 689.

*Decrees affirmed.*

of the contract as pleaded must be such as to leave no reasonable doubt in the mind of the . . . [court] that the contract as alleged was in fact made . . .; (6) and the work constituting performance must be such as is referable solely to the contract sought to be enforced and not such as might be reasonably referable to some other and different contract; (7) the contract must be one based upon an adequate and legal consideration . . .; (8) proof of mere disposition to devise by will or convey by deed by way of gift, or as a reward for services, is not sufficient, but there must be shown a real contract to devise by will or convey by deed made before the acts of performance relied upon were had.' " *Thompson* v. *St. Louis Union Trust Co.* 253 S. W. 2d 116, 120.