### Sharp v. Munda, et al.
*[Cite as 4 AOA 21]*

*Case No. C-890227*
*Hamilton County (1st)*
*Decided June 20, 1990*

*Hermanies & Major and Anthony D. Castelli, Esq., 30 Garfield Place, Suite 740, Cincinnati, Ohio 45202, for Plaintiffs-Appellants.*

*Rendigs, Fry, Kiely & Dennis and Frederick Brockmeier IV, Esq., 900 Central Trust Tower, Fourth and Vine Streets, Cincinnati, Ohio 45202, for Defendant-Appellee Rino Munda, M.D.*

*Pamela W. Popp, Esq., 30 Garfield Place, Cincinnati, Ohio 45202, for Defendant-Appellee Robert W. Ritzi, M.D.*

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket and journal entries, the original papers and pleadings from the Hamilton County Court of Common Pleas, the transcript of the proceedings, the assignments of error and the briefs and arguments of counsel. To provide the appropriate analysis of the issues in dispute, we have, *sua sponte*, removed the case from our accelerated calendar.

The final order from which this appeal is taken is that which granted the motion of the defendants-appellees, Drs. Rino Munda and Robert W. Ritzi, for summary judgment and which dismissed the complaint with prejudice.

It is apparent from the record that on October 25, 1985, the appellant's deceased, Lowell E. Sharp, was taken to the operating room at Christ Hospital to replace a malfunctioning catheter. At the outset Dr. Munda, the surgeon performing the procedure, used only a local anesthetic. However, during attempts to remove it, the catheter broke and retracted into the patient's abdomen. The decision was then made to put Mr. Sharp under general anesthesia in order to retrieve the unremoved portion of the catheter. General anesthesia and intubation were per-

formed by Dr. Ritzi. During the surgery Mr. Sharp presented signs of lack of oxygen, hypotension, and brachycardia. Corrective measures, including reintubation by Dr. Ritzi, were undertaken and the surgery was completed. Mr. Sharp, however, never regained consciousness. He fell into a coma, suffered anoxic encephalopathy (brain damage due to lack of oxygen), and died on November 20, 1985, after the decision was made not to continue dialysis.

I.

The appellant's sole assignment of error is that the trial court erred by granting the appellees' motion for summary judgment. Before deciding this issue, however, we must first address the contention raised in the briefs that one of the appellant's two expert witnesses, Dr. Peter Kane, was incompetent to testify as an expert witness on the issue of liability under Evid. R. 601.

Subparagraph (D) of Evid. R. 601 provides that a person is not competent to testify as an expert in a medical-malpractice case as to the issue of liability unless he is a licensed physician and devotes "three-fourths of his professional time to active clinical practice in his field of licensure, or to its instruction in an accredited university." In *McCrory v. State* (1981), 67 Ohio St. 2d 99, 423 N.E.2d 156, the Ohio Supreme Court made clear that the rule applies only to expert testimony on the narrow issue of liability, and that testimony on proximate cause may be heard from a person who fails to meet the qualitative and quantitative standards of the rule. Thus, even were this argument successful, Dr. Kane's opinion on proximate cause would still be admissible.

Dr. Kane has been board-certified in anesthesiology since 1969. He is currently licensed in New York, with previous licensures in Pennsylvania and Michigan. He is employed in the department of anesthesiology by the State University of New York Health Science Center in Syracuse as an anesthesiologist and a director of cardiovascular anesthesia. He was the director of the resident training program in anesthesiology at the Health Science Center from 1973 to 1981. His present title is Associate Professor and medical director of the respiratory care program. He stated in his affidavit that sixty-five to seventy percent of his professional time is spent either actually administering anesthesia or assisting or supervising residents while they administer anesthesia. He described the balance of his professional time as "involved with work that is

related or adjunctive to patient care such as administering the residency program in anesthesiology or administering the respiratory therapy program." Asked upon deposition when he had last personally performed anesthesia, he responded: "Saturday night. No. Friday night" (T.d. 22, at 13). He explained that the case involved a fractured ankle requiring general anesthesia (*Id.*).

Weighing Dr. Kane's background, we note that he qualifies as competent under Evid R. 601 if he devotes three-fourths of his professional time to instruction of clinical practice in his field of licensure at an accredited university. The rule does not define "instruction," nor does it attempt to quantify a minimum number of hours that a full-time professor of medicine, such as Dr. Kane, must actually spend in the classroom, laboratory, or operating room in the presence of students. In the absence of any express direction in the rule, or case law clearly defining "instruction," we do not interpret Evid. R. 601 as requiring that a full-time professor of medicine actually spend three-fourths of his time in the classroom. The Fourth District Court of Appeals recently visited the same question, noting that "devoting three fourths of one's professional time to instruction of clinical practice does not necessitate being in the classroom every hour." *Nicholson v. Landis* (February 27, 1990), Athens App. No. 1404, slip. op. (LEXIS) at 11, prior proceeding in 27 Ohio App. 3d 107, 499 N.E.2d 1260.

We recognize, however, as did the court in *Nicholson*, that even in the case of a full-time professor of medicine there must be some quantitative standard of clinical, as opposed to administrative, involvement. Such a standard is necessary to effectuate the purpose of the rule, which is to prevent the unfairness of those who are not involved in direct patient care passing judgment on those who are. In *Nicholson*, the court excluded the testimony of a professor of medicine where (1) he spent fifty percent of his professional time involved in administrative duties such as interviewing prospective residents and keeping records, (2) he spent "little or no time" instructing or dealing with residents, and (3) his actual teaching consisted of two two-hour lectures every twelve weeks.

On the state of this record, we find Dr. Kane's duties to be vastly different than those of the physician-professor in *Nicholson*. Only thirty to thirty-five percent of Dr. Kane's professorship is involved in administrative tasks. Most importantly, in contrast to the physician in *Nicholson*,

Dr. Kane's duties of "instruction" do not consist entirely of a rare lecture in a classroom, with no involvement in the residency program. Rather, Dr. Kane, who was formerly the director of the residency program in anesthesiology, still spends up to seventy percent of his time either personally administering anesthesia or supervising residents who are performing anesthesia. Clearly he has the necessary involvement in direct patient care to be aware of the exigencies that may arise to confront and confound a practicing anesthesiologist.

In reaching our decision on this issue, we note the judicial view often expressed that Evid. R. 601(D) should not be applied in a manner to subvert its purpose or make proof of malpractice unduly burdensome. See, *e.g., Crosswhite v. Desai* (Aug. 24, 1989), Greene App. No. 88-CA-99, unreported. In this regard it bears emphasis that not only does Dr. Kane meet the qualitative standard of Evid. R. 601(D) by being licensed, but he exceeds it by being board-certified in his specialty of anesthesiology. Moreover, the clinical activity he engages in requires him, when not personally administering anesthesia, to observe, judge, critique and guide others in the proper science and techniques of anesthesiology. He is sequestered in neither laboratory nor classroom. We find, therefore, that he satisfies the competency requirements of Evid. R. 601(D).

## II.

We turn next to the main issue presented by the appellant's assignment of error:

"Whether the trial court erred when it granted the appellees' motions for summary judgment. In granting appellees' motions, the trial court found specifically that the appellant had failed to provide sufficient expert medical testimony on the elements of professional negligence and proximate causation."

The elements of a medical negligence, or malpractice, claim in Ohio were set out in *Bruni v. Tatsumi* (1976), 46 Ohio St. 2d 127, 246 N.E.2d 673. Firstly, the plaintiff must show by a preponderance of the evidence that the injury complained of was caused by a physician whose conduct deviated from that of a physician or surgeon of ordinary skill, care and diligence under similar circumstances. Secondly, the plaintiff must establish by a preponderance of the evidence that the injury complained of was "the direct and proximate" result of the physician's deviation from the same standard. It is necessary that an opinion used to establish causation be expressed in terms of probability as opposed to

possibility: a 50-50 chance will not suffice. *Cooper v. Sisters of Charity, Inc.* (1921), 27 Ohio St. 2d 242, 272 N.E.2d 97; *Shepherd v. Midland Mut. Life Ins. Co.* (1949), 152 Ohio St. 6, 87 N.E.2d 156.

Civ. R. 56(C) states, in pertinent part, that upon motion and reply:

"Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of facts, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. * * * A summary judgment shall not be rendered unless it appears from such evidence or stipulation and only therefrom, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, such party being entitled to have the evidence or stipulation construed most strongly in his favor."

The record establishes that the appellant's second expert, Dr. Richard Foley, is board-certified in general and thoracic surgery with two professorships, both clinical. During his deposition Dr. Foley clearly stated his opinion that Dr. Munda deviated from standard care when he made a "technical error by breaking off the catheter" (T.d. 17, at 45). Moreover, although his answers to questions concerning probable cause are certainly subject to interpretation, he stated that "progressing to the general anesthesia set the stage for something," and that "[i]f [the catheter] had not broken probably nobody would be here in the room today" (*Id.* at 23-24). Although disclaiming that he was competent to give testimony on the standards of care for a board-certified anesthesiologist, Dr. Foley was nonetheless asked about language in his report on this subject. He stated that from his review of the record, there appeared to be "a very possible airway problem of which there could be numerous etiolgies" (*Id.* at 37). He listed the possible etiologies as a plug in the endotracheal tube, "the fact that the cuff herniates over the top," pump failure, or "the fact that the tube is not in the right place or the tube moved * * *" (*Id.*).

Dr. Foley later prepared an affidavit on February 17, 1989, which was submitted in opposition to appellees' motions for summary judgment. Therein he reiterated his opinion that "[t]he act of breaking off the catheter, by Dr. Munda, was technical error and therefore, was a

deviation from accepted medical practice." He then added that he did not believe that this deviation "specifically" lead to the death of Mr. Sharp, because the actual cause of Mr. Sharp's demise was "either the malposition of the endotracheal tube causing an esophageal intubation or an airway obstruction." He added, though, that general anesthesia would not have been required had the catheter not broken, in which case Mr. Sharp would not have experienced the anoxic episode which lead to his death.

Contrary to the arguments of counsel, we discern no inherent contradiction between Dr. Foley's deposition testimony and his affidavit, nor do we find any basis in the record to infer that the trial court found the two contradictory. Moreover, we conclude that, construed in a light most favorable to the appellant, Dr. Foley's statements present a basis from which a reasonable mind could conclude that (1) Dr. Munda deviated from the proper standard of care by removing the catheter in such a way that it broke, and (2) but for Dr. Munda's deviation, there would have been no need for the surgery and general anesthesia, the occurrence of which lead directly to Mr. Sharp's death. We conclude, also, that a reasonable mind could conclude that the risk of accident attendant on placing one under general anesthesia was foreseeable to Dr. Munda.

Upon deposition Dr. Kane stated that proper procedure, considering Mr. Sharp's condition, required Dr. Ritzi to first administer a dose of 150-200 milligrams of anesthesia, wait for its effect, and then determine any additional dose (T.d. 22, at 39-41). In this context he testified that he could not quantify a proper dose; rather, he stated that the proper dose was "enough." Under this analysis, he opined that Dr. Ritzi "overdosed" the patient by giving him an initial dose of 500 milligrams (*Id.*). Asked whether he thought the case involved an esophageal intubation, Dr. Kane stated, "It could have been in the esophagus" (T.d. 22, at 46). Elsewhere he stated that it was "quite possible" that the patient had an esophageal intubation (*Id.* at 47). Dr. Kane also indicated that the improvement of color following mask ventilation and reintubation were factors that made him think it was an esophageal intubation (*Id.* at 48). Later, after related questioning, Dr. Kane was asked, "Doctor, to back-track just a moment to the possibility of esophageal intubation, do you know, with reasonable medical certainty, whether this was

an esophageal intubation?" Dr. Kane's response was, "No" (*Id.* at 57).

Dr. Kane subsequently prepared an affidavit on February 17, 1989, which was submitted in opposition to the appellees' motion for summary judgment. Therein he reiterated and further explained his opinion that Dr. Ritzi initially administered too strong a dosage of anesthetic to Mr. Sharp. He opined that without the initial overdose Mr. Sharp would not have suffered the anoxia which lead to his death.

With regard to the prospect of an improper intubation, Dr. Kane stated in his affidavit that although he could not be certain, "it appears to me that it was more probable than not that it was an esophageal intubation." In support of this statement, Dr. Kane referred to the presence of brachycardia and myocardial hypoxia, the act of reintubation, and the improvement in circulatory status after oxygen was delivered through mask breathing. According to Dr. Kane, the "intubation was handled inappropriately and this was also a cause of the irreversible brain damage done to Mr. Sharp." Dr. Kane then concluded that Mr. Sharp's brain and heart had suffered from a lack of oxygen "as a result of deviation from accepted practice in the anesthetic procedure carried out by Dr. Ritzi and that as a result Mr. Sharp suffered irreversible brain damage which was the cause of a coma and his ultimate death." He added that he could not find "any evidence to suggest that it was probable that there was some other cause of the lack of oxygen to the brain other than as a result of the fault of the anesthesiologist."

Again, despite the urgings of counsel, we fail to see how Dr. Kane's deposition and affidavit "contradict" each other in the nullifying sense urged upon us. The only palpable permutation in Dr. Kane's position is upon the issue of whether an esophageal intubation occurred:

"upon deposition he referred to this as "quite possible" and in his affidavit he referred to it as a probability. In this regard, we note that the term 'quite possible' has been construed as the equivalent of 'probable.' *Boze v. Indust. Comm.* (1940), 32 Ohio L. Abs. 238. We also fail to see how Dr. Kane's admission upon deposition that he could not state with certainty whether an esophageal intubation occurred precluded him from stating that it probably did."

The cases cited to us for the proposition that affidavits that contradict prior sworn deposition testimony should be treated as a nullity, entitled to absolutely no weight, are inapposite, since in

those cases the affiants were plaintiffs and their later written statements were patently an attempt to avoid the fatal consequences of a prior factual admission going to the heart of their cause of action. *See Woodall v. Pilarczyk* (Aug. 21, 1985), Hamilton App. No. C-840756, unreported; *Blizzard v. Fazio's Grocery* (Feb. 15, 1984), Hamilton App. No. C-830336, unreported. In contrast, the case at bar presents only an arguable shift in tone by an expert opinion witness, the consequence of which should best be argued at trial. See *Crosswhite v. Desai, supra.*

Finally, we note that a fair reading of Dr. Kane's deposition and affidavit makes clear that the materiality of his opinion does not necessarily depend upon whether an esophageal intubation occurred. He stated quite clearly in his affidavit that he believed that the initial dosage of anesthesia was a cause of Mr. Sharp's ultimately lethal anoxia.

We hold, therefore, that the trial court erred in its conclusion that the appellant had failed to present sufficient expert evidence on the issues of negligence and proximate cause such that reasonable minds could differ. Rather, considering the state of this record, particularly when viewed in a light most favorable to appellant, we conclude that a genuine issue of material fact exists and that the trial court erred in granting summary judgment.

The judgment of the court of common pleas is reversed, and this cause is remanded for further proceedings in accordance with law.

*Judgment reversed and cause remanded.*

UTZ, P.J., DOAN and HILDEBRANDT, JJ.